### THOMAS B. WALES & others *vs.* THE CHINA MUTUAL INSURANCE COMPANY.

A time policy of insurance on a vessel contained an extension clause, as follows: " If on a passage at the end of the term, the risk to continue at *pro rata* premium until arrival at port of destination." At the end of the term the vessel was on a passage to Woosung, under a charter party which provided that, " on arrival at Woosung, the captain shall take his orders from the chief of the French marine service at that port, who will indicate to him within twenty-four hours if he is to discharge at Woosung, or go on to Chusan, and that after the arrival of the ship at Woosung the marine might keep her as long as it might wish, and send her to such safe and accessible port as it might judge desirable." *Held*, that if no orders to go to another port were received within twenty-four hours after notice to the chief of the French marine service at Woosung of her arrival there, that should be regarded as her port of destination, within the meaning of the extension clause.

CONTRACT on a policy of insurance, by which the defendants insured the plaintiffs in the sum of $15,000 on the ship

Hesperus, for one year from the 23d of November 1859, containing these stipulations: "If on a passage at the end of the term, the risk to continue at *pro rata* premium until arrival at port of destination." " To continue during the voyage aforesaid, on the vessel until she shall be arrived and moored at anchor twenty-four hours in safety, and on the property until landed."

At the trial in this court, before *Merrick*, J., it appeared from the deposition of the captain that at the end of the year the vessel, laden with coal, was on a passage from Liverpool under a charter party to the French marine, which provided that she should carry her cargo to China; that she should "proceed direct, and without calling at any port, to Woosung, near Shanghai, there to take orders. On arrival at Woosung, the captain shall take his orders from the chief of the French marine service at that port, who will indicate to him within twenty-four hours if he is to discharge at Woosung, or go on to Chusan. If the delivery of the cargo is not to be made at Woosung, the captain shall sail for the destination which shall have been indicated to him within the twenty-four hours following the notice which shall be given to him, unless hindered by force major." " Any delay arising out of the act of one or other of the contracting parties in the execution of the " above conditions " shall give rise, to the profit of the injured party, to the payment by the other party of an indemnity of fifty centimes per register ton for each day's delay." " The marine shall, besides, have the power, after the arrival of the ship at Woosung, (or at Chusan, if sent to that island,) to keep her as long as the marine may wish, and send her to such safe and accessible port as it may judge desirable." The vessel arrived, on the 25th of December 1860, at a place near the mouth of the Shanghai River, which the plaintiffs for the purposes of the trial admitted to be within the port of Woosung, and on the next day the captain gave notice thereof to the French authorities, and received orders not to discharge at Woosung, but to remain at anchor there until he should receive orders in writing. On the 6th of January following, the ship was totally destroyed by fire.

The judge ruled that, under the policy and charter party, **the**

liability of the defendants did not necessarily terminate with the arrival of the ship at Woosung; that Woosung was not necessarily her port of destination, but that her port of destination would be the place at which she should be finally ordered by the French marine to discharge her cargo; and if the loss occurred before such orders had been received, and without an unreasonable delay, awaiting such orders, it would be within the policy.

The case was thereupon reserved for the determination of the whole court, with the agreement that if the above ruling was right the defendants should be defaulted, and the case sent to an assessor to determine the amount of damages; otherwise the case should stand for trial.

*B. R. Curtis & H. Gray, Jr.*, for the plaintiffs. The port into which a vessel may come is described in three ways; as a port of arrival, a port of destination, and a port of discharge. A port of arrival is a port to which a ship voluntarily goes for any purpose. A port of destination is a place to which a ship is destined to go to accomplish a purpose of an existing voyage; as, if in ballast, to take in cargo; if carrying cargo on freight, to discharge cargo and earn freight. It is not the ultimate termination of a series of voyages. Nor is it a place to which a ship is proceeding to obtain advices, or revenue permits, or a bill of health, or other like means of accomplishing a beneficial purpose of an existing voyage. But it is a place where a purpose of an existing voyage is intended to be accomplished. *Coolidge* v. *Gray*, 8 Mass. 531. *Lapham* v. *Atlas Ins. Co.* 24 Pick. 1. Marsh. Ins. (4th ed.) 203, and cases cited. A port of discharge is the place of the actual and voluntary discharge of the cargo, or a substantial part thereof. The general destination of the Hesperus was China, and the particular port at which the object of her voyage was to be accomplished could not be ascertained till she received orders from the French marine there. Under these circumstances, she was protected by the policy until her arrival at such port. 1 Arnould on Ins. 455–458. *The Heureux Joseph*, Emerigon des Assur. c. 13, sect. 18, § 3. This case is within the principles of insurance to a port

named and a market, in which the vessel is protected while go-
ing to any number of ports for a market, and is not bound to
go at all to the port named. *Houston* v. *New England Ins. Co.*
5 Pick. 89. *Deblois* v. *Ocean Ins. Co.* 16 Pick. 308. *Gaither* v.
*Myrick*, 9 Maryland, 138. No part of the freight was due at
Woosung. The seamen could not have demanded their wages
or left the ship there. A general average loss would not have
been adjusted there. An insurance on cargo or freight would
not have terminated there. If this policy had covered ship,
cargo and freight, Woosung would not have been the port of
destination of the cargo. Can it then be considered as the port
of destination of the ship, when the sole object of the voyage
was to carry and deliver the cargo ?

*B. F. Thomas & J. D. Bryant*, for the defendants, cited *Gookin*
v. *New England Ins. Co.* 12 Gray, ; *Cole* v. *Union Ins. Co.*
Ib. ; *Amer. Ins. Co.* v. *Hutton*, 24 Wend. 330; S. C. 7 Hill,
(N. Y.) 321; *Lapham* v. *Atlas Ins. Co.* 24 Pick. 1; *Donnell* v.
*Columbian Ins. Co.* 2 Sumner, 366 ; *Palmer* v. *Warren Ins. Co.*
1 Story R. 364 ; *Blackett* v. *Royal Exchange Assur. Co.* 2 Cr. &
Jerv. 251; *Eyre* v. *Marine Ins. Co.* 6 Whart. R. 247 ; 3 Kent
Com. (6th ed.) 309 ; 1 Arnould on Ins. 456, 457.

BIGELOW, C. J. The rule of construction applicable to the
clause usually inserted in time policies on vessels, by which it is
stipulated that if the vessel insured is " at sea," or " on a pas-
sage " or " a voyage," (which are equivalent expressions,) at the
expiration of the term, the risk is to continue until her arrival at
a port of destination, is now settled in this commonwealth by
the recent cases of *Gookin* v. *New England Ins. Co.* 12 Gray,
, and *Cole* v. *Union Ins. Co.* Ib. . It was held in those
cases that, by this extension of the risk beyond the term, it was
not the intention to enlarge it so as to embrace the entire voy-
age or succession of voyages on which a vessel might be bound
at the expiration of the time named in the policy, and until her
arrival at her port of final destination ; but that it was designed
to have a much more restricted meaning, and to include only
such period of time as might elapse between the expiration of
the original term insured, if the vessel was then at sea, and her

arrival at the next port to which she was destined for the purposes of the voyage on which she was bound. If, for example, a vessel insured for a year was at the expiration of that time at sea, bound on a voyage to an intermediate port, there to take in or discharge cargo, or for other like purpose, and thence to another port, the risk under the extension clause, so called, would not continue until her arrival at the latter port, but would terminate at the first port to which she was bound for the purpose of accomplishing one of the objects of the entire voyage on which she was then destined.

This interpretation of the policy is founded on the presumed intent of the parties, as derived from the words of the clause taken in connection with the other parts of the contract. The main object of a policy of this nature is to insure the vessel for the term of time specified. This in legal phrase is the voyage insured. The clause extending the risk beyond this period is only incidental to this main purpose. It is not designed to change the character of the risk, if the vessel happens to be at sea at the expiration of the term insured, so as to convert a policy on time into a policy for a round voyage or a succession of voyages on which the vessel may then be bound. Such, however, would be the character which it would assume on the occurrence of the specified contingency, if it was construed to embrace the voyage to the final port of destination, or that to which she might be ultimately bound at the end of the prosecution of the entire voyage. But such very clearly was not the intent with which the extension clause was added to policies on time. It was designed for a different purpose. If a vessel happened to be at sea when the designated term for which she was insured expired, especially if she had been long absent from port, the owner would be without such information concerning her condition and situation as would enable him to procure new insurance upon her, to take effect at the expiration of the previous term. It was therefore necessary to provide for the continuance of the risk until her arrival in port, so that opportunity might be afforded to the owner to ascertain the state of the vessel by a communication from the master or otherwise, and thus be enabled to obtain a

new policy to take effect at and from her arrival at the port where she then was. It is obvious that this object could be attained as well at any intermediate port at which the vessel might arrive in the course of her voyage as at her final port of destination, and that to extend the risk beyond such arrival would be contrary to the manifest intent of the parties. It has therefore been settled that, in order to ascertain whether a liability for the loss of a vessel happening in the course of a voyage has arisen under the extension clause in a time policy, it is only necessary to determine whether the loss occurred before or after the arrival of the vessel in a port which may properly be deemed a port of destination, although an intermediate one, short of that to which she was ultimately bound in the prosecution of the voyage in which she was then engaged.

What constitutes such port must necessarily depend very much on the circumstances existing in each case. It has been defined to be a port to which the vessel " has resorted for the purposes of the voyage;" *Gookin* v. *New England Ins. Co. ubi supra;* also as any port, " whether at home or abroad, for lading or discharge, or any other object or business voluntarily pursued." *American Ins. Co.* v. *Hutton,* 24 Wend. 330, 336. Definitions so general and vague leave room for nice and difficult questions. Suppose a vessel, for instance, is bound on a voyage to China, with directions to touch at Calcutta, Singapore or other intermediate port, for the sole purpose of receiving orders as to the particular port in China to which she shall go. Would such an intermediate port be that of her destination, within the meaning of the extension clause? But no such question arises in the present case, in the aspect in which it is presented to us under the ruling of the court at the trial. The case seems to have been reserved without any reference to that clause in the charter party under which the vessel was employed at the time of the loss, which provides that on the arrival of the ship at Woosung, " the captain shall take his orders from the chief of the French marine service at that port, who will indicate to him within twenty-four hours if he is to discharge at Woosung, or

go on to Chusan." Indeed it does not appear by the evidence, so far as it is reported, that any such orders were given.

But apart from this, the view on which the case was disposed of at the trial seems to have gone to the extent of holding that neither Woosung nor any other port would be her port of destination, within the meaning of the policy, unless it was the port at which she should be finally ordered by the French marine to discharge her cargo. This, we think, was clearly erroneous. Looking at the charter party as we must, not for the purpose of construing the policy, but to ascertain whether this was an intermediate port of destination, we cannot doubt that after the expiration of twenty-four hours following the arrival of the ship at Woosung, during which no orders were given to the master by the French officer in command as to the place of discharge of the vessel, Woosung was the port of destination, according to a just interpretation of the extension clause. It was then wholly uncertain, under the stipulations of the charter party, how long the vessel would remain at Woosung, or whether she would be sent on to Chusan or some other port in China, after the lapse of an indefinite period, or whether she might not be ordered to discharge her cargo at Woosung, and there finally terminate her voyage ; so that, in one of the contingencies contemplated by the charter party, the occurrence of which depended, not on the will of the master or owners, but on the orders which might be given by the charterer, Woosung might become a port of discharge as well as of destination. It seems to us that it would be a palpable violation of the rule of interpretation applicable to the extension clause in the policy, and contrary to the reasons on which the rule is founded, to hold that, after the expiration of twenty-four hours subsequent to the arrival of the vessel at Woosung, she was not then at her port of destination. It was then clearly a port which she had visited voluntarily in the accomplishment of one of the purposes of the voyage. If the risk did not then terminate, it was extended indefinitely. We can see no good reason, if the policy remained in force at all after the failure to give orders for the further prosecution of the voyage within twenty-four hours subsequent to the

arrival at Woosung, why it must not also be held to cover the risk during the days, weeks or months during which she might be thus detained, and also thence on a voyage to China or other port in China to which she might eventually be ordered. Such an extension of the risk would hardly be contended for by the learned counsel for the plaintiffs. Yet we do not see why it is not a legitimate conclusion which must follow, if it be held that Woosung was not the port of destination of the vessel, within the meaning of the extension clause, under the facts assumed in the ruling of the court. But in the view which we take of the case, no such unreasonable result follows. After the expiration of twenty-four hours subsequent to the arrival of the vessel at Woosung, she was at a port where the consignee of the cargo was. She was to remain there indefinitely under his direction, and for an ultimate purpose not determined on, and which might not be arrived at for a long period of time. Under such circumstances, Woosung must be deemed to be the port of destination, within the meaning of the contract declared on.

*New trial granted.*